## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH A. KOPENHAVER,    :
    :
        Plaintiff    :    No. 3:15-CV-0485
    :
    vs.    :    (Judge Nealon)
    :
CAROLYN W. COLVIN, Acting    :
Commissioner of Social Security,    :
    :
        Defendant    :

**FILED**
**SCRANTON**

SEP 3 0 2016

Per_____
    DEPUTY CLERK

## MEMORANDUM

On March 10, 2015, Plaintiff, Kenneth A. Kopenhaver, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively.  (Doc. 1).  The parties have fully briefed the appeal.  For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be affirmed.

---

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2.  Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his applications for DIB and SSI on September 29, 2011, alleging disability beginning on August 1, 2011 due to a combination of herniated discs, a fractured T4 disc, nerve damage in his leg and arm, seizures, depression, and high blood pressure. (Tr. 17, 182).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on April 18, 2012. (Tr. 15).  On June 14, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 15).  An initial hearing was held on May 22, 2013, before administrative law judge Jarrod Tranguch, ("ALJ"), at which Plaintiff and an impartial vocational expert Nadine Henzes, ("VE"), testified. (Tr. 15, 51).  On June 25, 2013, the ALJ issued a an unfavorable decision denying Plaintiff's applications for DIB and SSI. (Tr. 15).  On July 9, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 12).  On January 9, 2015, the Appeals

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on May 20, 2015.  (Doc. 11).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on March 10, 2015. (Doc. 1). On May 20, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 10 and 11). Plaintiff filed a brief in support of his complaint on August 12, 2015. (Doc. 14). Defendant filed a brief in opposition on October 14, 2015. (Doc. 17). Plaintiff filed a reply brief on November 27, 2015. (Doc. 20).

Plaintiff was born in the United States on April 28, 1972, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 195). Plaintiff did not graduate from high school or obtain his GED, but can communicate in English. (Tr. 181, 183). His employment records indicate that he previously worked as a cashier and an auto technician. (Tr. 183, 199).

In a document entitled "Function Report - Adult" filed with the SSA on October 16, 2011, Plaintiff indicated that he lived in a house with his mother. (Tr.

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

227).  When asked how his injuries, illness or conditions limited his ability to work, Plaintiff stated, "Can't do much[.] I try to stretch every morning[.] I take my service dog out for a 8 min[ute] walk 2 times a day.  I watch T.V.  I can't sit or stand for to[o] long [and] laying to[o] long hurts me too."  (Tr. 227).  Plaintiff took care of his girlfriend because they were both disabled and also took care of his girlfriend's dog. (Tr. 228).  He was able to prepare frozen meals, sandwiches, and soup once a day for five (5) to ten (10) minutes, but his girlfriend made all the "regular meals." (Tr. 229).  He was able to vacuum, sweep, and take the trash out, but his girlfriend did the laundry, cooking, and dishes. (Tr. 229).  In terms of personal care, he had difficulty with dressing, bathing, and using the toilet because of difficulty standing. (Tr. 228).  He was unable to do yard work because it caused him pain in his back and leg and because he could not lift "heavy things." (Tr. 229).  He went outside one (1) to two (2) times a day when it was nice outside, but he could not go outside when it was raining or cold because it would worsen his pain. (Tr. 230).  He went shopping once a week for twenty (20) minutes for food, books, and items for his dog. (Tr. 230).  His hobbies included playing cards, playing games, reading, using the computer, and watching "a lot of T.V." (Tr. 230).  He did not have problems getting along with others. (Tr. 231).  He was unable to drive or go out alone due to seizures. (Tr. 230).  He could walk for five

4

(5) minutes before needing to rest for about six (6) minutes and sit and stretch. (Tr. 232). He used a walker and brace, both prescribed by a physician. (Tr. 233). When asked to check what activities his illnesses, injuries, or conditions affected, Plaintiff did <u>not</u> check seeing or getting along with others. (Tr. 231).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs or to take medicine, but did need reminders to go places. (Tr. 229, 231). He could count change, but could not pay bills, handle a savings account, or use a checkbook because he did not have a checking account. (Tr. 230). He could pay attention for about ten (10) minutes, was not able to finish what he started, did not follow written and spoken instructions well, did not handle stress well, and handled changes in routine "fine." (Tr. 232-233).

At his hearing on May 22, 2013, Plaintiff testified that what was preventing him from returning to work were the pain in his neck and back, his nerve pain, and constant headaches. (Tr. 64). He also had pain down his right leg and foot that was constant, and down his left arm. (Tr. 66-67). Oxycontin and Xanaflex did not really help, and injections gave only temporary relief for "a week or two." (Tr. 65). Plaintiff testified that he was willing to under neck fusion surgery, but that there were issues with insurance coverage. (Tr. 65-66). In terms of limitations

5

resulting from his left arm impairment, Plaintiff stated that he could not lift anything over his head because of left arm numbness and grip problems and that he would drop things almost every day. (Tr. 71, 73). He also testified that his weight lifting limit would be around about ten (10) pounds or "maybe a little more." (Tr. 71). In terms of walking, Plaintiff stated he was able to walk for about ten (10) to fifteen (15) minutes before needing to stop and take a break due to pain and balance issues. (Tr. 71). He occasionally used a cane that was not prescribed by a doctor. (Tr. 71-72). He stated he was able to stand in one spot for about five (5) minutes before he would become uncomfortable. (Tr. 72). He was able to sit with his legs pulled back, but had issues with extending them because that would strain his back. (Tr. 72).

Plaintiff testified that his seizures were not predictable, and that he could not get on medication because he had no health insurance to have the blood work done necessary for the medication prescription. (Tr. 67). He also was applying for disability due to depression and high blood pressure, but was not on medication for either medical problem. (Tr. 68).

With regards to sleep, Plaintiff stated that he had difficulty falling asleep and staying asleep. (Tr. 69). He also stated that he would take naps for about a half an hour once or twice a day, every day. (Tr. 69).

In terms of activities of daily living, Plaintiff testified that he was able to take care of his personal needs without help, do the laundry, vacuum, mop, sweep, dust, and do the dishes. (Tr. 74-75). He was able to perform these chores for fifteen (15) to twenty (20) minutes before needing to take a break, and sometimes would not continue performing chores after his break. (Tr. 77). His landlord took care of the yard work. (Tr. 74). He stated was unable to engage in activities he enjoyed, including fishing and hunting, due to pain. (Tr. 75-76).

## MEDICAL RECORDS

On August 1, 2011, Plaintiff presented to the ER after a motor vehicle accident, complaining of left extremity weakness, head pain, and back pain. (Tr. 408). Plaintiff underwent a CT scan of his thoracic spine. (Tr. 407). The impression was that he had mild superior endplate compression at the T4 level without evidence of an acute fracture line or other findings of an acute injury. (Tr. 407). He also underwent a CT scan of his cervical spine, which revealed a normal alignment of the cervical spine without evidence of fracture or subluxation, mild degenerative changes within the cervical spine, and no evidence of soft tissue swelling. (Tr. 409). He also underwent a CT scan of his lumbar spine, which revealed that there were streak artifacts that limited his evaluation at the L5-S1 level. (Tr. 410).

7

On August 2, 2011, Plaintiff underwent an MRI of his cervical spine. (Tr. 411). It revealed a small left foraminal disc herniation causing mild left foraminal stenosis at the C4-C5, a moderate paracentral disc herniation causing mild left foraminal stenosis at the C5-C6 level, uncovertebral hypertrophy and disease causing mild bilateral foraminal stenosis at the C6-C7 level, and no evidence of disc disease or spinal or foraminal stenosis at the C7-T1 level. (Tr. 411). The impression stated that there was mild cervical spondylosis. (Tr. 411).

On October 27, 2011, Plaintiff underwent another EMG of his upper left extremity. (Tr. 439). The findings were that there was electrophysiological evidence of an acute left C6 radiculopathy without axonal drop out, but no evidence of peripheral nerve entrapment, neuropathy, or myopathy. (Tr. 439).

On August 11, 2011, Plaintiff had an appointment at Shore Orthopaedic Group for pain in his axial cervical spine with radiation into the left upper extremity, pain the axial lumbar spine with radiation into the right lower extremity, and a pain rating at seven and a half (7.5) out of ten (10). (Tr. 443). Exacerbating factors were walking and sitting. (Tr. 443). His physical examination found the following: significant limitation with range of motion with lumbar flexion, a positive spurling maneuver to the left, a positive straight leg raise test on the right, pain with sustained hip flexion, sensory dysesthesias in the

right L5 distribution and left C6-C7 distribution, 5/5 strength except for a slight decrease at the left deltoid secondary to pain, 5/5 strength in the bilateral lower extremities except for a hip flexor secondary to pain, and trace deep tendon reflexes in the bilateral lower extremities. (Tr. 443). Plaintiff was instructed to attend physical therapy, and if that failed, to undergo a selective nerve root block. He was also prescribed Roxicodone. (Tr. 444).

On September 6, 2011, Plaintiff had a follow-up appointment, and reported that his lower back pain had worsened significantly with the new onset left C6 radicular pain and right lower extremity radicular pain as a result of an August 2011 motor vehicle accident. (Tr. 447). He rated his pain at an eight (8) out of ten (10). (Tr. 447). His physical examination noted that: (1) there continued to be parathesias throughout the left upper extremity mostly in the left C6 distribution; (2) there was a positive spurling maneuver to the left; (3) there was pain with cervical flexion greater than extension; (4) continued pain with sustained hip extension; (5) sensory dysesthesias present in the right L5 distribution; (6) 5/5 strength except for a slight decrease in the left deltoid secondary to pain in the neck region; (7) 5/5 strength in the bilateral lower extremities except for hip flexor on the right secondary to pain; and (8) trace reflexes in the bilateral lower extremities. (Tr. 447). Plaintiff was again encouraged to undergo a physical

9

therapy program, was started on OxyContin and Roxicodone, and was instructed to undergo an EMG.

On September 16, 2011, Plaintiff had an appointment at Shore Orthopaedic Group. His exam revealed he had significant cervical spasm over the thoracic fracture and severe pain in the lumbar area. (Tr. 445). He was instructed to follow-up in one (1) month. (Tr. 445).

On September 29, 2011, Plaintiff had a follow-up appointment, and it was noted that there were no significant changes in his physical examination from his prior visit. (Tr. 446). He reported that he felt that he needed to take an extra dose of Roxicodone, and rated his pain at a seven (7) out of ten (10). (Tr. 446). Plaintiff was instructed to take OxyContin and use the Roxicodone for breakthrough pain. (Tr. 446).

On October 27, 2011, Plaintiff had a follow-up appointment for electrodiagnostic testing of his upper left extremity. He reported that he continued to have significant pain in his left upper extremity along with associated numbness and tingling. (Tr. 448). He also reported that he continued to have pain in his right lumbar spine with radiation to his right lower extremity, and rated his pain at a seven (7) to eight (8) out of ten (10). (Tr. 448). His exam revealed continued sensory dysesthesias over the left upper extremity, positive spurling maneuver on

the left, and pain with cervical flexion greater than extension. (Tr. 448). Plaintiff was given a refill of OxyContin and Roxicodone, and was scheduled for a left C6 epidural steroid injection. (Tr. 448).

On November 19, 2011, Plaintiff underwent a consultative examination performed by Dr. Koshnu. (Tr. 435). Plaintiff's mental status examination revealed that he: (1) walked slowly; (2) had a hard time sitting or getting up from a chair; (3) was alert and oriented; (4) had a stable but aggravated mood; (5) had a calm and cooperative affect; (6) denied suicidal and homicidal ideations and hallucinations; and (7) reported past feelings of suicide. (Tr. 436). Dr. Koshnu noted several diagnoses including depression secondary to a medical condition, back pain, a seizure disorder, neck pain, and a Global Assessment Function score of fifty (50) to fifty-five (55). (Tr. 437).

On November 25, 2011 and December 20, 2011, Plaintiff had another appointment, and reported similar symptomology. (Tr. 449-450). His physical examination remained unchanged, and he received medication refills. (Tr. 449-450).

On February 7, 2012, Plaintiff had a follow-up appointment. (Tr. 452). Plaintiff reported that he had parasthesias and radiculopathy that ran down his right leg to the top of his right foot, pain down his left leg, difficulty turning his

11

head from left to right, pain and spasm that radiated down his left arm, a weak grip on his left side, a constant and stabbing burning pain in between his neck and middle of his back, and an absence of relief from two (2) steroidal injections. (Tr. 452). His physical exam revealed: significant cervical spasm; sensory loss over the left upper extremity into the left biceps; weakness down his left upper extremity; a positive spurling test on the left side; pain with cervical flextion and extension; and decreased rotation to the left upon cervical rotation. (Tr. 452). Plaintiff's EMG demonstrated acute left C6 radiculopathy consistent with disc herniation on the left at C4-C5 and disc protrusion at C5-C6 that was pressing on his C6 nerve root causing paraesthesias in the C6 distribution. (Tr. 452). It was concluded that Plaintiff was a candidate for surgical intervention, specifically at the C4-C5 and C5-C6 levels with discectomy and fusion due to "his significant progressive radiculopathy parethesias and weakness in this distribution." (Tr. 453).

On February 16, 2012, Plaintiff had a follow-up appointment, and reported that he had improvement in terms of his neck pain after a cervical epidural steroid injuction, but that he continued to require significant pain medication in the form of OxyContin and Roxicodone. (Tr. 451). His exam results were unchanged. (Tr. 451). Plaintiff underwent a left C6 transforaminal epidural steroid injection and

was given a refill of his pain medications. (Tr. 451).

Plaintiff continued to have appointments with this orthopaedic group through May 7, 2013, for continued cervical spine pain with radiation into his left upper extremity and low back pain with radiation into the right lower extremity. (Tr. 480-512, 741-742). His physical exams consistently revealed 5/5 strength bilaterally in his upper extremities, sensory dysesthesias in his left bicep, and a positive Spurling's test on the left. (Tr. 481-512, 741-742). Plaintiff was consistently told to continue taking OxyContin and Roxicodone. (Tr. 481-512, 741-742). He also underwent numerous cervical steroid injections. (Tr. 481-512, 741-742).

On March 30, 2012, Dr. Muthiah performed a consultative examination of Plaintiff. (Tr. 459). His examination revealed that Plaintiff's cranial nerves were intact; his tone was normal; his deep tendon reflexes, biceps, triceps, and knee jerks were normally present; he had minimal weakness of the right hand and reduced grip strength of the right hand; and he had paraspinal muscle spasm and tenderness in the cervical and upper thoracic region. (Tr. 460). Dr. Muthiah's impression was that Plaintiff had cervical radiculopathy, lumbar disc disease status post surgery, and a seizure disorder. (Tr. 461). He found that Plaintiff's grip strength was a 4/5 on the left and a 5/5 on the right; that he could get on and off

the examination table; that he was unable to talk on his heels and toes secondary to severe back pain; that he was unable to squat; that he could arise from a sitting position in a chair; that he could perform fine and dexterous movements using his right hand; that he had a difficult time picking up smaller objects and holding things in his left hand and had a tendency to drop items; that his gait was antalgic; and that his examination was consistent with cervical radiculopathy. (Tr. 461-462). . He opined that Plaintiff could: lift up to twenty (20) pounds; carry up to ten (10) pounds; stand and walk one (1) to two (2) hours and sit for two (2) hours in an eight (8) hour workday; perform postural activities occasionally; had difficulty handling and fingering and using his left hand; and had environmental restrictions including heights, moving machinery, and temperature extremes. (Tr. 461).

On April 17, 2013, Dr. Rathi from Shore Orthopaedics opined that Plaintiff was able to: occasionally lift and carry up to twenty (20) pounds; never lift and carry anything over twenty (20) pounds; sit for twenty (20) minutes and stand and walk for ten (10) minutes each at one time; stand and for thirty (30) minutes each in an eight (8) hour workday; occasionally reach overhead and other ways, handle, finger, feel, and push/ pull with his right hand; occasionally reach overhead and in other ways with his left hand, but never handle, finger, feel, or push/ pull; operate

14

his right and left feet occasionally; occasionally climb stairs, but never climb ladders or scaffolds, kneel, crouch, or crawl; and occasionally tolerate unexpected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odor, fumes, extreme cold and heat, and vibrations; and tolerate moderate noise. (Tr. 669-674).  In terms of activities of daily living, Plaintiff could ambulate without any aids, use public transportation, prepare simple meals, and take care of his personal hygiene, but could not shop, travel alone, walk a block at a reasonable pace on rough or uneven terrain, climb a few steps at a reasonable pace without the use of a handrail, or sort, handle, or use paper/ files.  (Tr. 674).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

<u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe</u>

<u>v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565

(1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938));

<u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);

<u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

16

supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not

18

disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

19

requirements of the Social Security Act through December 31, 2014. (Tr. 17). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his amended alleged onset date of August 1, 2011. (Tr. 17).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "degenerative disc disease of the lumbar spine, status-post surgeries including disc replacement; degenerative disc disease of the cervical spine with cervical radiculopathy; and a compression fracture of the thoracic spine at T4 (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 17).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of section 1.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 18-19).

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

At step four, the ALJ determined that Plaintiff had the RFC to perform a range of sedentary work with limitations. (Tr. 19). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). [Plaintiff] can lift and carry up to ten pounds. He can stand and/ or walk for no more than 2 hours in an 8-hour workday. He can sit for up to 6 hours in an 8-hour workday, but would need to have the option to alternate between sitting and standing at will every half hour or so, but he would not be off task while changing positions. He can occasionally use his left upper extremity for pushing and pulling, such as the operation of levers or hand controls. He can occasionally use his right lower extremity for pushing and pulling, such as the operation of pedals and foot controls. [Plaintiff] can occasionally stoop, kneel, crouch, and use ramps or climb stairs; however, he should avoid overhead work, balancing, crawling, and climbing ladders, ropes, or scaffolding. [Plaintiff] can occasionally perform fine manipulation such as fingering and feeling with his non-dominant left upper extremity. He should avoid concentrated exposure to extreme cold, extreme humidity, vibrations, wet or slippery conditions. He should avoid exposure to hazards such as moving machinery and unprotected heights. Finally, [Plaintiff] is limited to work that is generally described as unskilled or low-level semi-skilled work with no more than a specific vocational preparation (SVP) of 3.

(Tr. 19).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform past relevant work, but that given

his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform. (Tr. 24-26).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time from August 1, 2011 through the date of the decision. (Tr. 26).

## DISCUSSION

On appeal, Plaintiff alleges that: (1) the ALJ erred in concluding that Plaintiff's impairments did not meet or equal Listing 1.04A; (2) the ALJ erred in rejecting the opinion of treating physician Dr. Rathi; and (3) Defendant failed to meet its burden at Step Five that, based on his RFC determination, there were jobs that existed in significant numbers in the economy that Plaintiff could perform.[8]

---

8. Because Plaintiff failed to support this assertion, this argument has been waived and is not proper for consideration by this Court. See Harris v. Dow Chemical Co., 2014 WL 4801275 (3d Cir. Sept. 29, 2014) (holding that an argument is waived and abandoned if briefly mentioned in the summary of the argument, but not otherwise briefed); Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it . . . and . . . 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citing Frey v. Grubine's RV, 2010 WL 4718750, at *8 (M.D. Pa. Nov. 15, 2010); Karchnak v. Swatara Twp., 2009 WL 2139280, at *21 (M.D. Pa. July 10, 2009) ("A party waives an issues if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration.") (citing Gorum v. Sessions, 561 F.3d 179, 185 n.4 (3d Cir. 2009)).

(Doc. 14, pp. 3-15). Defendant disputes these contentions. (Doc. 17, pp. 13-21).

### 1. Listing 1.04A

Plaintiff asserts that he met all the criteria of Listing 1.04A, and the ALJ erred in finding he did not meet this listing. (Doc. 14, pp. 5-11). In order to meet a listing, the plaintiff has the burden of proving that he meets all of the criteria of a respective listings. Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987); Zebley, 493 U.S. 521, 532 (1990). When a plaintiff's impairment meets only some of a Listing criteria, the impairment does not meet the Listing, no matter how severe the impairment is. 20 C.F.R. §§ 404.1525(c)(3); Zebley, 493 U.S. at 530. In order to be considered presumptively disabled under Listing 1.04A, the plaintiff has the burden of proving that he has a disorder of the spine resulting in a nerve root compression that is characterized by (1) a neuro-anatomic distribution of pain; (2) a limitation in the motion of the spine; AND (3) motor (atrophy with associated muscle weakness) accompanied by sensory or reflex loss. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 104.A.

In the case at hand, the ALJ determined in his opinion, when read as a whole, that Plaintiff's impairment did not meet or equal Listing 1.04A. "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d

Cir. 2000); see Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (holding that while an administrate law judge is required to set forth the reasons for his or her decision, and that a bare conclusory statement is insufficient to meet this requirement, an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of finding to permit meaningful review."); see also Diaz v. Commissioner of Social Security, 577 F.3d 500, 504 (3d Cir. 2009) ("In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505, n.3 (3d Cir. 2004). The ALJ, of course, need not employ particular 'magic' words: 'Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' Jones, 364 F.3d at 505.").

In reading the decision as a whole and in reviewing the evidence, it is determined that substantial evidence supports the ALJ's decision at Step Three that Plaintiff's back impairments did not meet or medically equal Listing 1.04A

because there is no medical evidence that Plaintiff had the requisite motor loss. It was consistently noted by Dr. Rathi, Plaintiff's treating physician, that Plaintiff had 5/5 motor strength in bilateral upper and lower extremities, and did not have positive straight leg raising tests in both the supine and seated positions. (Tr. 21-23, 443, 446-447, 450-451, 482, 484, 486, 490-491, 494). As such, Plaintiff did not meet all the criteria to be considered presumptively disabled under Listing 1.04A, and the ALJ's decision will be not vacated on this assertion.

## 2.   Medical Opinion Evidence

Plaintiff asserts that the ALJ erred in assigning limited weight to the opinion of his treating physician, Dr. Rathi. (Doc. 15, pp. 11-15).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

25

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012

26

U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the relevant medical opinion evidence, the ALJ gave the opinions of the state agency consultative examiners partial weight because the "postural, environmental, and manipulative restrictions are largely supported by the longitudinal findings and the claimant's somewhat credible testimony. However, the record supports additional sedentary exertional restrictions, while the moderate mental limitations are not supported by the minimal outpatient treatment record, the documented clinical finds, and [Plaintiff's] reported ongoing capabilities." (Tr. 24). The ALJ gave limited weight to the opinion of Dr. Rathi because "the

27

assessed restrictions are not entirely consistent with the longitudinal conservative treatment record, the documented clinical and examination findings, and [Plaintiff's] ongoing capabilities." (Tr. 24).

Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ properly afforded weight to the opinion evidence, and based on the RFC, did not err in affording limited weight to the opinion of Dr. Rathi. First, Dr. Rathi's own treatment records for Plaintiff continually show Plaintiff had 5/5 motor strength in his bilateral upper and lower extremities and an improving range of motion. (Tr. 22-23, 450-451, 482, 484, 486, 490-491, 494). Other medical records also note that Plaintiff had 5/5 muscle strength and intact bilateral deep tendon reflexes. (Tr. 21-23, 482). This evidence is inconsistent with the limitations opined by Dr. Rathi, as discussed by the ALJ. (Tr. 21-26). As such, substantial evidence supports the ALJ's RFC, and it will not be disturbed on appeal.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed,

and the appeal will be denied.

A separate Order will be issued.

**Date**: September 30, 2016

/s/ William J. Nealon
**United States District Judge**